**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

NO. 5:10-CV-00172-D

| | | |
|---|---|---|
| WILLIAM C. MANN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM &** |
| | ) | **RECOMMENDATION** |
| | ) | |
| M. DALE SWIGGETT, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

This cause comes before the Court for determination of damages incurred by plaintiff

William C. Mann in this diversity action for libel against defendant M. Dale Swiggett.   Mann has

submitted numerous memoranda regarding damages (DE-118, DE-119, DE-120, DE-121,

DE-134) and an evidentiary hearing was held September 19, 2012.   Swiggett has filed no

memoranda with respect to the issue of damages, and the time for doing so has expired.

Accordingly, this matter is ripe for adjudication.   Pursuant to 28 U.S.C. 636(b)(1), this matter is

before the undersigned for the entry of a memorandum and recommendation.   Upon consideration

of the evidence and arguments of the parties, for the reasons stated herein it is RECOMMENDED

that Mann be awarded $100.00 in compensatory damages and $25,000.00 in punitive damages.

## I.    BACKGROUND

Briefly, the underlying facts giving rise to this action are as follows:   In 1985, Mann, a

past president of the Professional Golfers Association of America ("PGA") purchased a country

club development in Alamance County, North Carolina. Compl. ¶¶ 5-6, DE-3. On March 26, 2009, Mann and his wife filed for Chapter 7 bankruptcy in the United States Bankruptcy Court for the Middle District of North Carolina; their discharge was entered on December 7, 2009. *Id.* ¶ 7. During the pendency of the bankruptcy proceeding, Mann and his wife moved to a home in South Carolina that they ultimately purchased. *Id.* ¶ 8.

On April 7, 2010, Swiggett mailed a letter to hundreds of recipients referencing, among other things, Mann's "environmental crimes," "fraudulent transactions," and "creation of unbuildable lots." *Id.* ¶ 12. The letter compared Mann to Ruffin Poole, who at the time was a well-known defendant in a federal tax evasion case, and alleged that Mann "left the area after declaring bankruptcy to purchase with cash a house down in Cherry Grove, SC." *Id.* ¶¶ 12-13. On April 15, 2010, Swiggett mailed a second letter with attachments to the judge who had presided over Mann's bankruptcy case, asserting that Mann had installed an unqualified golf club management group "to cover up sludge spreading and spills" and had committed "fraud, lack of disclosure, and conflicts of interest" in the bankruptcy case. *Id.* ¶¶ 14-15.

Mann initiated the instant action on April 29, 2010, alleging that Swiggett knew the statements in the April 7, 2010 and April 15, 2010 letters were false, or acted with reckless disregard for their truth or falsity, and that the statements were "libelous and actionable as such, as well as defamatory per se" and "damaging, and intentionally so, to the plaintiff's reputation and to his livelihood." Compl. ¶¶ 16-18. Appearing pro se, Swiggett denied the allegations and asserted that he believed in the truth of the information contained in the letters. Answer ¶ 16, DE-25. Over the ensuing course of litigation in this Court, Swiggett filed numerous motions which Mann sought to strike as irrelevant and frivolous.

2

On May 4, 2012, Chief Judge Dever entered an order granting Mann's fifteenth motion to strike filings by Swiggett, noting that "[d]espite this court's repeated warnings to Swiggett, Swiggett has continued to clutter the docket with nonsensical filings and continued to disregard this court's orders, the local rules, and the Federal Rules of Civil Procedure." Summ. J. Order 2, DE-112. In light of the numerous frivolous filings by Swiggett, his refusal to comply with the Court's orders and local rules, and his bad faith, Chief Judge Dever concluded that the sanction of striking Swiggett's answer was warranted and appropriate. Chief Judge Dever also awarded summary judgment in favor of Mann, concluding that "Swiggett's statements accusing Mann of crimes are explicit, unambiguous and defamatory" and thus libelous *per se*. Summ. J. Order 6, DE-112. In so doing, Chief Judge Dever observed that "because Swiggett's statements are libel *per se*, malice and injury are presumed." *Id.* The sole remaining issue to determine--the amount of Mann's damages--was then referred to the undersigned for an evidentiary hearing.

The evidentiary hearing was initially scheduled for May 23, 2012 but was continued until May 24, 2012 because of a conflict with other federal litigation. (DE-117). On May 23, 2012, Swiggett filed a pro se petition, In Re Maurice Swiggett, AKA M. Dale Swiggett, No. B-12-80774C-12 D, in the Middle District of North Carolina under Chapter 12 of the Bankruptcy Code. (DE-123). Pursuant to 11 U.S.C. § 362(a)(1), the Chapter 12 filing automatically stayed the evidentiary hearing scheduled for May 24th. On July 9, 2012, Mann informed the Court that the bankruptcy court had dismissed Swiggett's Chapter 12 petition, thereby lifting the automatic stay. (DE-125). The evidentiary hearing was accordingly rescheduled for July 19, 2012. (DE-126). On July 9, 2012, Swiggett filed a second pro se petition, In Re Maurice Dale Swiggett, No. B-12-81015 C-11, in the Middle District of North Carolina, this time pursuant to Chapter 11 of

the Bankruptcy Code. (DE-128). The evidentiary hearing was again stayed pending relief from the bankruptcy court.

On September 10, 2012, the Honorable William L. Stocks, United States Bankruptcy Judge, entered an order dismissing the Chapter 11 bankruptcy petition and barring Swiggett from commencing any case or seeking relief under Chapter 11, Chapter 12, or Chapter 13 of the Bankruptcy Code for a period of 180 days. (DE-131-1). In his memorandum opinion, Judge Stocks found that Swiggett had filed his bankruptcy petitions in bad faith for the purpose of delaying the evidentiary hearing in the instant case. Mem. Op. 10-11, DE-131-2. Judge Stocks further found that the "frivolous and nonsensical filings [Swiggett] has made throughout this case" represented "a flagrant abuse of the bankruptcy process and strongly evidences bad faith on the part" of Swiggett in commencing the case. *Id.* at 11-12. Upon notice of the lifting of the automatic stay imposed by the bankruptcy court, the evidentiary hearing was rescheduled for September 19, 2012. (DE-133).

On September 12, 2012, Swiggett filed a motion styled "Motion for Declaration All Rulings & Judgments be Rendered Null & Void" and "Motion for Attorney James Craven to be Held in Contempt of Court as an Officer of the Court." (DE-132). In his motion, Swiggett accused Mann of criminal activities and fraud, among other things, and requested that Mann's attorney, James Craven, be held in contempt for "abus[ing] the Court schedule as part of his Felonious Conspirator Tactics along with all of his legal proceedings to hide the truth and his personal participation in this 'Ponzi Scheme'" Mot. 6, DE-132. The Court denied Swiggett's motion as frivolous on September 18, 2012. (DE-137).

The evidentiary hearing took place on September 19, 2012. Evidentiary Hr'g Tr.,

DE-140.  Both parties attended, with Swiggett appearing pro se.  At the hearing, Mann verified

on direct examination that he served as the president of the Professional Golfers Association of

America ("PGA") from 1999 until 2000, and is a member of the PGA Hall of Fame.  Hr'g Tr.

4:20-25, 5:1-3.  Mann is presently employed as a faculty member in the PGA Golf Management

program at Coastal Carolina University ("CCU") in Conway, South Carolina.  Hr'g Tr. 8:6-8.

He also serves on the Titleist Advisory Board of the Acushnet Company.  Hr'g Tr. 9:1-2.  After

Swiggett's accusations regarding Mann's alleged criminal activities surfaced, various persons

contacted Mann with "questions about it because they had heard what was going on."  Hr'g Tr.

7:23-24.  Mann was forced to "explain this embarassing situation," Hr'g Tr. 9:6-7, to at least

thirty persons, including his wife, children, family members, friends, CCU faculty and university

hierarchy, PGA officials, and the senior vice-president of Titleist.  Mann described the fall-out

from the libel as "relentless, and constant, and almost overbearing for several years now."  Hr'g

Tr. 10:9-10.  Mann believes that the libel has adversely affected his ability to engage in consulting

work.  He testified that he "planned on doing that [consulting work], had no calls, and I know that

people have researched this, my name, and found this stuff out."  Hr'g Tr. 10:12-14.

       During cross-examination, Swiggett asked Mann to explain "what changes in [his] life,

financially, has [the libel] made?" Hr'g Tr. 27:1-2.  Mann replied:

>        The most significant changes in my life have been the fact that I have been
> totally embarrassed professionally and personally for over two years.  Any
> consulting activities that I was going to engage in have not appeared I think, at least
> primarily, because of the fact that when people go and look me up online, all the
> falsehoods that you posted to thousands of people, thousands, repeatedly over and
> over again for the last two years have precluded me that opportunity of doing that.
> It's embarrassed me to my profession.  It's embarrassed me personally.  I have
> had to explain it, as I said earlier, to the University, to other people, to PGA of
> America, and the people's opinions of whom I hold very high.  And I value my
> reputation, I value my name, and you have disparaged those constantly and

incessantly for two years.
Hr'g Tr. 27:4-18.

Mann testified that the libel had not affected his salary or his place of residence, however.   Hr'g

Tr. 29:12-20.   He explained:

> When [Swiggett] wrote the article, I was employed at Coastal Carolina University.
> I'm making the same amount now I was then, and had to explain to the University
> because I was afraid I was going to lose that job, as to the fact that [Swiggett's]
> claims were all false and have no basis in fact; as I did to everybody I testified to
> earlier.   And, as far as income, I am certain in my mind that my ability for income
> has been adversely affected by the falsehood that [Swiggett] printed consistently up
> until this month.   It is not allowing me to do consulting work and be considered for
> other opportunities that I might have otherwise.

Hr'g Tr. 31:9-19.

Swiggett presented no evidence relevant to the issue of damages but argued that Mann

should be awarded only a minimal amount.   Swiggett also stated he was indigent and would be

unable to pay any judgment imposed.

Based on the evidence before the Court, Mann requests an award of two million dollars in

compensatory damages and two million dollars in punitive damages.[1]

---

1. Mann initially requested compensatory damages in the amount of "$500,000 together
with punitive damages as the Court may allow," Compl. ¶¶18-19, but later increased his request to
one million dollars in compensatory damages and specified that he was seeking an additional one
million dollars in punitive damages.   Pl.'s Mem. Damages, May 9, 2012, DE-118.   In his
supplemental memorandum on damages, Mann increased his request to two million dollars in
compensatory damages and two million dollars in punitive damages.   Pl's Second Supplemental
Mem. Damages, September 13, 2012, 3, DE-134.   In addition, Mann requested $100,000 in
attorneys' fees.   "'As a general rule, attorneys fees are not awarded to the prevailing party without
statutory authority.'" Stamm v. Salomon, 144 N.C. App. 672, 683, 551 S.E.2d 152, 159-60 (2001)
(quoting Brown v. Rhyne Floral Supply Mfg. Co., Inc., 89 N.C. App. 717, 717, 366 S.E.2d 894,
895, cert. denied, 322 N.C. 834, 371 S.E.2d 275 (1988), cert. denied, 488 U.S. 1045 (1989)), disc.
review denied, 355 N.C. 216, 560 S.E.2d 139 (2002).   In the absence of express authority,
attorneys' fees are not allowed as part of court costs in civil actions; if relevant statutes do not
permit reimbursement of attorneys' fees, the court may not award attorneys' fees even on equitable
grounds.   Point Intrepid, LLC v. Farley, __ N.C. App. __, 714 S.E.2d 797, 805 (2011).   At the
evidentiary hearing, counsel for Mann acknowledged that there was no statutory basis under North

6

## II.    **LEGAL BACKGROUND**

As this case is before the Court upon diversity of the parties, under *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), the substantive law of North Carolina applies to Mann's claim for damages arising from libel. *See* <u>Sleem v. Yale Univ.</u>, 843 F. Supp. 57, 60-63 (M.D.N.C. 1993) (explaining the constitutional limitations on presumed damages in state-based libel actions and noting that, where the case concerns a private person and non-public issues, "what North Carolina has chosen to do with regard to fault and damages is controlling"). Mann seeks compensatory and punitive damages. Because Swiggett has committed libel *per se*, malice and damages are presumed from the fact of publication and no proof is required as to any resulting injury. <u>Renwick v. News & Observer Publ'g Co.</u>, 310 N.C. 312, 316, 312 S.E.2d 405, 408 (1984). However, the evidentiary burden remains with Mann to demonstrate that the amount of damages sought "is based upon a standard that will allow the finder of fact to calculate the amount of damages with reasonable certainty." <u>Olivetti Corp. v. Ames Business Systems, Inc.</u>, 319 N.C. 534, 547-48, 356 S.E.2d 578, 586 (1987); *see also* <u>Nguyen v. Taylor</u>, __ N.C. App. __, 723 S.E.2d 551, 559 (2012) (applying the "reasonable certainty" burden in the context of a defamation case).

For a defamation claim, compensatory damages include general damages and special damages. "'[G]eneral damages are such as might accrue to any person similarly injured, while special damages are such as did in fact accrue to the particular individual by reason of the particular circumstances of the case.'" <u>Pleasant Valley Promenade v. Lechmere, Inc.</u>, 120 N.C. App. 650, 671, 464 S.E.2d 47, 62 (1995) (quoting <u>Penner v. Elliott</u>, 225 N.C. 33, 35, 33 S.E.2d 124, 126 (1945)). For defamation *per se*, general damages are presumed and include such matters

Carolina law that would allow the Court to award attorneys' fees in this case. Hr'g Tr. 36:3-8. Accordingly, the undersigned deems Mann's request for attorneys' fees abandoned.

as loss of reputation or standing in the community, mental or physical pain and suffering, inconvenience, or loss of enjoyment which cannot be definitively measured in monetary terms. Roth v. Greensboro News Co., 217 N.C. 13, 22-23, 6 S.E.2d 882, 889-90 (1940); Iadanza v. Harper, 169 N.C. App. 776, 779-80, 611 S.E.2d 217, 221, *disc. review denied*, 360 N.C. 63, 621 S.E.2d 624 (2005). In contrast, special damages are tangible, quantifiable monetary losses, such as lost income, medical expenses, or other direct financial harm. Iadanza, 169 N.C. App. at 779-80, 611 S.E.2d at 221. Emotional distress and mental suffering alone do not prove monetary loss. Donovan v. Fiumara, 114 N.C. App. 524, 527, 442 S.E.2d 572, 575 (1994).

With regard to punitive damages, they "may be awarded only if the claimant proves that the defendant is liable for compensatory damages and that one of the following aggravating factors was present and was related to the injury for which compensatory damages were awarded: (1) Fraud[;] (2) Malice[; or] (3) Willful or wanton conduct." N.C. Gen. Stat. § 1D-15(a). The plaintiff "must prove the existence of an aggravating factor by clear and convincing evidence." N.C. Gen. Stat. § 1D-15(b). In the instant case, as noted *supra*, malice is presumed from the existence of libel *per se*. Renwick, 310 N.C. at 316, 312 S.E.2d at 408.

The purpose of awarding punitive damages is "to punish a defendant for egregiously wrongful acts and to deter the defendant and others from committing similar wrongful acts." N.C. Gen. Stat. § 1D-1. In determining the amount of punitive damages, if any, to be awarded, section 1D-35 of the North Carolina General Statutes instructs that the trier of fact:

> (1) Shall consider the purposes of punitive damages set forth in G.S. 1D-1; and

> (2) May consider only that evidence that relates to the following:

>> a. The reprehensibility of the defendant's motives and conduct.

8

b.  The likelihood, at the relevant time, of serious harm.

c.  The degree of the defendant's awareness of the probable
    consequences of its conduct.

d.  The duration of the defendant's conduct.

e.  The actual damages suffered by the claimant.

f.  Any concealment by the defendant of the facts or consequences
    of its conduct.

g.  The existence and frequency of any similar past conduct by the
    defendant.

h.  Whether the defendant profited from the conduct.

i.  The defendant's ability to pay punitive damages, as evidenced
    by its revenues or net worth.

An award of punitive damages may "not exceed three times the amount of compensatory damages

or two hundred fifty thousand dollars ($250,000), whichever is greater."    N.C. Gen. Stat. § 1D-25;

*see also* Rhyne v. K-Mart Corp., 358 N.C. 160, 190, 594 S.E.2d 1, 21 (2004) (discussing the

purpose of punitive damages and upholding the constitutionality of N.C. Gen. Stat. §1D-25).

Awards of damages are, of course, case-specific and vary considerably depending upon the

facts presented.   The Fourth Circuit has affirmed a judgment of $10,000 in compensatory

damages and $5,000 in punitive damages in a libel action brought by the plaintiff, a public figure,

against a defendant magazine that published two nationally-distributed defamatory articles.

*See* Appleyard v. Transamerican Press, Inc. 539 F.2d 1026, 1028 (1976).   In *Ellis v. Northern Star

Co.*, the Supreme Court of North Carolina upheld a jury verdict awarding the plaintiff brokerage

company $32,500 in actual damages and $12,500 in punitive damages for libel after the defendants

9

sent a defamatory letter to several of the plaintiff's clients, causing the loss of at least one customer. 326 N.C. 219, 227-228, 388 S.E.2d 127, 132 (1990).

More recently, the North Carolina Court of Appeals upheld the trial court's order awarding five police officers one million dollars apiece in compensatory damages and two million dollars apiece in punitive damages stemming from their involuntary appearance in a documentary DVD created and sold by the defendant rap artist and the various record and publishing companies associated with him. Nguyen v. Taylor, __ N.C. App. __, 723 S.E.2d 551, 563-64 (2012). One part of the DVD featured the rap artist and his film crew involved in an altercation with security guards and the plaintiff police officers at a mall in Greensboro, North Carolina. *Id.* at __, 723 S.E.2d at 555. The rap artist was arrested for criminal trespassing, communicating threats and disorderly conduct. *Id.* The videotaped encounter was "heavily edited" and made it seem "as though [the rap artist] was wrongfully arrested." *Id.* In awarding compensatory damages, the trial court found that:

> 37. As a result of Defendants' actions, Plaintiffs have been substantially injured. The Plaintiffs are consistently recognized as being the officers who arrested [the rap artist]. They are often accused of racism by those who recognize them as a result of the DVD, which undermines their authority as police officers. They have legitimate fears for their own safety, as well as for the safety of their families.
>
> 39. The DVD and the statements made by the Defendants continue to be widely available across the world, and the footage remains readily available on the internet. As a result, it is likely that the Plaintiffs will continue to be damaged by these materials wherever they go and for the remainder of their careers.

*Id.* at __, 723 S.E.2d at 560. In support of its award of punitive damages, the trial court found that the defendants' conduct and motives were reprehensible, that the harm was foreseeable, and that the defendants had profited in excess of forty million dollars from the DVD and had the ability to pay the punitive damages awarded. *Id.* at __, 723 S.E.2d at 561. The North Carolina Court of

10

Appeals held that the trial court had not abused its discretion in awarding the officers one million dollars in compensatory damages and two million dollars in punitive damages.

With these legal precepts in mind, the undersigned considers the evidence of damages in the instant case.

### III.    ANALYSIS

#### A.  Compensatory Damages

As the instant case involves libel *per se*, malice and damages are presumed from the fact of publication and no proof is required as to any resulting injury.  Renwick, 310 N.C. at 316, 312 S.E.2d at 408.   These presumed damages include Mann's loss of reputation or standing in the community, his mental or physical pain and suffering, inconvenience, or loss of enjoyment that cannot be definitively measured in monetary terms.  Roth, 217 N.C. at 22-23, 6 S.E.2d at 889-90. Mann may also be compensated for quantifiable loss, i.e., special damages, such as medical costs or lost income.  While damages are presumed, the evidentiary burden remains with Mann to demonstrate that he has been damaged in the amount sought "based upon a standard that will allow the finder of fact to calculate the amount of damages with reasonable certainty."  Olivetti Corp., 319 N.C. at 547-48, 356 S.E.2d at 586.

Here, Mann has presented little to support his request of two million dollars in compensatory damages.   At best, the evidence indicates embarrassment and inconvenience on Mann's part in responding to Swiggett's libel.  Mann testifed that Swiggett's statements "totally embarrassed [him] professionally and personally for over two years" and that he was forced to "explain the situation" to family members, friends, colleagues, and business professionals.   In addition, Mann testified he feared losing his faculty position at CCU.   Mann did not allege or testify to any mental

11

or physical pain and suffering or loss of enjoyment. Counsel for Mann elicited few details during his testimony regarding the context of Mann's "explanations" to family, friends, and colleagues—their duration, whether they were conducted in person or in writing, by telephone or otherwise, or who initiated them. Notably, Mann did not testify that anyone actually believed Swiggett's statements. No one other than Mann testified, and the only supporting affidavit is from Mann. Given Mann's position as a faculty member at CCU, as a board member of Titleist, and as a past president of the PGA, it seems unlikely that anyone who knew Mann--particularly family members and friends--would consider Swiggett's outlandish accusations to be true. And while Mann testified he feared for his job, he did not expand upon this statement or offer evidence indicating that Swiggett's statements jeopardized his faculty position. Thus, there is little to suggest that Mann's standing in the community was damaged beyond a minimal amount.

Further, Mann presented no evidence of any special damages, such as medical bills or loss of income. Mann testified he was "certain in [his] mind" that Swiggett's statements caused him to lose consulting work he might have otherwise obtained. Under North Carolina law, "[i]n order for [a plaintiff] to show that [he] was deprived of an opportunity to make profits, [he] must first show that there was in fact such an opportunity." Olivetti Corp., 319 N.C. at 546, 356 S.E.2d at 586 (concluding that the plaintiff had failed to present sufficient evidence in support of the trial court's award of damages to show with reasonable certainty that the plaintiff lost an opportunity to make future profits). Mann offered no specific facts regarding his alleged lost consulting opportunities. He did not name any potential clients or the amount of money he might have earned but for Swiggett's libel. As such, his testimony is far too speculative to meet his burden of proving special damages in an amount based upon a standard that will "allow the finder of fact to

calculate the amount of damages with reasonable certainty." *Id.* at 547-48, 356 S.E.2d at 586. Because Mann presents no evidence of actual pecuniary loss, the undersigned concludes that an award of special damages is not appropriate.

Even if Mann had testified in greater detail regarding his embarrassment or damage to his livelihood, his request of two million dollars in compensatory damages is nevertheless excessive. In contrast to the police officers in *Nguyen* who received one million dollars in compensatory damages, Mann has not shown that the injury to his reputation has been severe, that his authority in his job has been undermined or compromised, or that Swiggett's statements placed him in legitimate fear for his security. He has alleged no emotional distress, mental or physical pain and suffering, or loss of enjoyment. Unlike the plaintiff in *Ellis*, Mann has not shown actual pecuniary loss. 326 N.C. at 227-28, 388 S.E.2d at 132. In sum, the evidence falls far short of Mann's demand. In light of the presumption of damages, however, and in acknowledgment of the inconvenience and embarrassment caused by Swiggett, the undersigned recommends an award of $100.00 in compensatory damages.

## B. Punitive Damages

Having found compensatory damages and considering the factors set forth in N.C. Gen. Stat. § 1D-35, the undersigned concludes that an award of punitive damages is also appropriate. The purpose of punitive damages is "to punish a defendant for egregiously wrongful acts and to deter the defendant and others from committing similar wrongful acts." N.C. Gen. Stat. § 1D-1. Despite being expressly instructed by the Court that his statements about Mann lack foundation and are libelous *per se*, the evidence of record indicates that Swiggett has continued unabated in his conduct. He continues to publish outlandish and unfounded statements against Mann. For

13

example, two days after Chief Judge Dever granted summary judgment in favor of Mann, Swiggett sent a mass e-mail referencing a "500 billion dollar PGA scam and cover up" that "span[s] over 400 bankrupt golf courses throughout all 50 states" perpetuated by "ex president of the PGA President Will Mann" and others.   E-mail, May 6, 2012, DE-118-9, DE-118-10.   Swiggett sent a similar e-mail on May 11, 2012 (DE-120-1) and recorded a "Claim of Lien" on August 14, 2012 with the Register of Deeds in Alamance County stating that "Will and Virginia Mann committed bankruptcy, mail, and mail fraud."   DE-134-1.   Swiggett also purposefully sought to delay the evidentiary hearing in this case by filing frivolous motions denouncing Mann in this Court and in the bankruptcy court in bad faith.

Given the reprehensibility of Swiggett's conduct, N.C. Gen. Stat. § 1D-35(a), Swiggett's awareness of the consequences of his behavior, *id.* at (c); the duration of his behavior, *id.* at (d); and the existence and frequency of similar conduct by Swiggett, *id.* at (g); but also considering the lack of pecuniary loss suffered by Mann, *id.* at (e), and Swiggett's apparent inability to pay punitive damages, *id.* at (i), the undersigned concludes that an award of $25,000.00 in punitive damages is sufficient to achieve the twin purposes of punishment and deterrence under N.C. Gen. Stat. § 1D-1.   Although any amount awarded may prove insufficient to deter Swiggett from what can only be described as an unfounded, bizarre personal vendetta against Mann, the sum is significant for a person of Swiggett's limited means.    The undersigned therefore RECOMMENDS that the Court award Mann $25,000.00 in punitive damages.


### IV.   <u>CONCLUSION</u>

For the reasons stated herein, the undersigned RECOMMENDS that the Court award

14

Mann $100.00 in compensatory damages, and $25,000.00 in punitive damages.

SO RECOMMENDED in Chambers at Raleigh, North Carolina on Tuesday, October 09, 2012.

_____
WILLIAM A. WEBB
UNITED STATES MAGISTRATE JUDGE